# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DONALD D. VENTRICE, JR., Individually and On Behalf of All Others Similarly Situated, | ) ) ) ) |
| Plaintiff, | ) Case No.  17-10151 ) |
| v. | ) JURY TRIAL DEMANDED ) |
| ARIAD PHARMACEUTICALS, INC., GEORGE W. BICKERSTAFF, III, ALEXANDER J. DENNER, JULES HAIMOVITZ, PARIS PANAYIOTOPOULOS, ANNA PROTOPAPAS, NORBERT G. RIEDEL, SARAH J. SCHLESINGER,TAKEDA PHARMACEUTICAL COMPANY LIMITED, and KIKU MERGER CO., INC., | ) CLASS ACTION ) ) ) ) ) ) ) ) ) |
| Defendants. | ) |

## COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

Plaintiff, by his undersigned attorneys, for this complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.      This action stems from a proposed transaction announced on January 9, 2017 (the "Proposed Transaction"), pursuant to which ARIAD Pharmaceuticals, Inc. ("ARIAD" or the "Company") will be acquired by Takeda Pharmaceutical Company Limited ("Parent") and Kiku Merger Co., Inc. ("Merger Sub" and together with Parent, "Takeda") through a tender offer currently scheduled to expire on February 15, 2017.

2.      On January 8, 2017, ARIAD's Board of Directors (the "Board" or "Individual Defendants") caused the Company to enter into an agreement and plan of merger (the "Merger Agreement") with Takeda.  Pursuant to the terms of the Merger Agreement, shareholders of ARIAD will receive $24.00 in cash for each share of ARIAD common stock.

3.      On January 19, 2017, defendants filed a Solicitation/Recommendation Statement (the "Solicitation Statement") with the United States Securities and Exchange Commission ("SEC") in connection with the Proposed Transaction.

4.      The Solicitation Statement omits material information with respect to the Proposed Transaction, which renders the Solicitation Statement false and misleading. Accordingly, plaintiff alleges herein that defendants violated Sections 14(e), 14(d), and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") in connection with the Solicitation Statement.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(e), 14(d), and 20(a) of the 1934 Act and Rule 14a-9.

6.      This Court has jurisdiction over defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7.      Venue is proper under 28 U.S.C. § 1391 because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## PARTIES

8.      Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of ARIAD common stock.

9.      Defendant ARIAD is a Delaware corporation and maintains its principal executive offices at 125 Binney Street, Cambridge, Massachusetts 02142.  ARIAD's common stock is traded on the NasdaqGS under the ticker symbol "ARIA."

10.      Defendant George W. Bickerstaff, III ("Bickerstaff") has served as a director of ARIAD since May 2016.  According to the Company's website, Bickerstaff is Chair of the Audit Committee and a member of the Compensation Committee.

11.      Defendant Alexander J. Denner ("Denner") has served as a director of ARIAD since February 2014 and is Chairman of the Board.  According to the Company's website, Denner is Chair of the Nominating and Corporate Governance Committee.

12.      Defendant Jules Haimovitz ("Haimovitz") has served as a director of ARIAD since May 2016.  According to the Company's website, Haimovitz is a member of the Audit Committee and the Nominating and Corporate Governance Committee.

13.      Defendant Paris Panayiotopoulos ("Panayiotopoulos") has served as a director, President, and Chief Executive Officer ("CEO") of ARIAD since January 2016.

14.      Defendant Anna Protopapas ("Protopapas") has served as a director of ARIAD since April 2015.  According to the Company's website, Protopapas is Chair of the Compensation Committee and a member of the Science & Medicine Committee.

15.      Defendant Norbert G. Riedel ("Riedel") has served as a director of ARIAD since April 2011.  According to the Company's website, Riedel is a member of the Audit Committee, the Compensation Committee, and the Science & Medicine Committee.

16.     Defendant Sarah J. Schlesinger ("Schlesinger") has served as a director of ARIAD since July 2013.  According to the Company's website, Schlesinger is Chair of the Science & Medicine Committee and a member of the Nominating and Corporate Governance Committee.

17.     The defendants identified in paragraphs 10 through 16 are collectively referred to herein as the "Individual Defendants."

18.     Defendant Parent is a corporation organized under the laws of Japan and a party to the Merger Agreement.

19.     Defendant Merger Sub is a Delaware corporation, a wholly-owned subsidiary of Parent, and a party to the Merger Agreement.

## CLASS ACTION ALLEGATIONS

20.     Plaintiff brings this action as a class action on behalf of himself and the other public stockholders of ARIAD (the "Class").  Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

21.     This action is properly maintainable as a class action.

22.     The Class is so numerous that joinder of all members is impracticable.  As of October 31, 2016, there were approximately 194,200,862 shares of ARIAD common stock outstanding, held by hundreds, if not thousands, of individuals and entities scattered throughout the country.

23.     Questions of law and fact are common to the Class, including, among others: (i) whether defendants violated the 1934 Act; and (ii) whether defendants will irreparably harm plaintiff and the other members of the Class if defendants' conduct complained of herein continues.

24.     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff has the same interests as the other members of the Class.  Accordingly, plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

25.     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede those non-party Class members' ability to protect their interests.

26.     Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class.  Therefore, final injunctive relief on behalf of the Class is appropriate.

### SUBSTANTIVE ALLEGATIONS

***Background of the Company***

27.     ARIAD is a biotechnology and pharmaceutical company that was founded in 1991.

28.     Today, the Company focuses on creating new medicines to advance the treatment of rare forms of chronic and acute leukemia, lung cancer, and other rare cancers.

29.     In December 2012, the Food and Drug Administration ("FDA") approved ARIAD's leukemia drug, Iclusig (ponatinib), for patients with chronic myeloid leukemia or Philadelphia chromosome-positive acute lymphoblastic leukemia.

30.     In addition to Iclusig, ARIAD's product pipeline includes: (1) Brigatinib (previously known as AP26113), an investigational, targeted cancer medicine that is in development for the treatment of patients with anaplastic lymphoma kinase positive ("ALK+") non-small cell cancer (NSCLC) whose disease is resistant to crizotinib; and (2) AP32788, a tyrosine kinase inhibitor ("TKI") designed to address an unmet medical need in a subset of non-small cell lung cancers.

31.     On May 9, 2016, ARIAD announced that it had entered into an agreement with Incyte Corporation ("Incyte") pursuant to which Incyte would acquire ARIAD's European operations.  As described in the press release announcing the agreement, "[a]t the close of the transaction, the companies will also enter into a license agreement whereby Incyte will obtain an exclusive license to develop and commercialize Iclusig® (ponatinib) in Europe and other select countries."  The press release further explained that the agreement would allow ARIAD to focus on promoting Iclusig in the U.S. market, "while strengthening its financial position and maintaining important optionality through a potential buy-back provision for the Iclusig license rights in the event of a change-in-control of ARIAD. . . ."

32.     The next day, ARIAD issued a press release wherein it reported its financial results for the first quarter of 2016, which included significant revenues from sales of Iclusig. The Company reported net product revenues from sales of Iclusig of $33.6 million, compared to $23.9 million in the first quarter of 2015, representing a 41% increase.  U.S. sales of Iclusig were $24.9 million for the quarter, compared to $18.7 million in the first quarter of 2015. Commenting on the financial results, Individual Defendant Panayiotopoulos stated:

> Iclusig demonstrated strong performance in both the U.S. and European markets during the first quarter of 2016 compared to the prior year period, primarily driven by increasing demand and new patient growth. Following our major announcement yesterday with Incyte regarding our agreement to divest our

European operations and license the commercial rights to Iclusig in Europe, we are on track to complete our strategic review this quarter aimed at delivering patient and shareholder value. We also look forward to the presentation of pivotal, registration data on brigatinib at ASCO, along with our planned filing for marketing approval of brigatinib in the U.S. in the third quarter of this year.

33.     On July 28, 2016, ARIAD issued a press release wherein it reported its second quarter and first half of 2016 financial results.  Net product revenue from sales of Iclusig continued to increase, reaching $65.3 million, compared to $27.8 million in the second quarter of 2015.  For the first half of 2016, this figure was $99.0 million, compared to $51.7 million in the first half of 2015.  U.S. sales of Iclusig for the quarter were $32.6 million, compared to $21.7 million in the second quarter of 2015, and $57.6 million for the first half of 2016, compared to $40.4 million for the first half of 2015, representing a 43% increase.  GAAP net income for the quarter was $109.8 million, compared to GAAP net loss of $63.2 million in the second quarter of 2015.  For the first half of 2016, GAAP net income was $56.1 million, compared to GAAP net loss of $115.8 million in the first half of 2015.  Individual Defendant Panayiotopoulos commented on the results, noting:

> We had a strong second quarter, during which we initiated a rolling NDA submission for brigatinib based on our data from the ALTA pivotal trial, presented four-year data from the PACE clinical trial for Iclusig, and advanced AP32788 for EGFR/HER2 exon 20 non-small cell lung cancer patients into a Phase 1/2 trial. We also strengthened our financial position through our agreement with Incyte and the strong sales performance of Iclusig. Our teams are focused on Iclusig growth, preparations for the potential launch of brigatinib in the U.S. and driving forward our promising pipeline.

34.     On November 7, 2016, ARIAD issued a press release wherein it reported its third quarter 2016 financial results.  The Company reported worldwide net product revenue from sales of Iclusig of $34.3 million for the quarter, a 25% increase from $27.5 million in the third quarter of 2015.  U.S. net product revenue from sales of Iclusig were $33.6 million, compared to $20.3 million in the third quarter of 2015.  Individual Defendant Panayiotopoulos commented on the

third quarter's results, stating:

> During the third quarter, ARIAD achieved several important milestones that further our commitment as a small, research-based biotechnology company to patients with rare cancers, including those with no other targeted treatment options available. Iclusig was approved in Japan and we received priority review from the FDA for brigatinib in crizotinib-treated ALK+ non-small cell lung cancer. We are continuing to invest heavily in R&D and to progress in enrolling in the OPTIC, OPTIC-2L and ALTA-1L trials for Iclusig and brigatinib, as well as our clinical trial for AP32788, a novel kinase inhibitor for a rare form of lung cancer involving mutations in the EGFR and HER2 genes, and for which there are currently no approved targeted treatments.

### *Background of the Proposed Transaction*

35.     The Proposed Transaction is the result of a flawed process.

36.     In the spring of 2015, the Company had preliminary discussions with Takeda regarding a potential licensing transaction for the Company's AP26113 product (now termed brigatinib) and entered into a confidentiality agreement with Takeda.

37.     Later in 2015, the Company had preliminary discussions about a possible sale of the Company and entered into related confidentiality agreements with several industry participants (including Takeda).

38.     In the spring of 2016, ARIAD engaged in preliminary discussions regarding a potential licensing transaction for ARIAD's ponatinib (Iclusig) product in certain European jurisdictions with multiple industry participants (including Takeda) and entered into a confidentiality agreement with Takeda.

39.     During 2016, the Company also undertook a process to explore potential partnerships with respect to the marketing and commercialization of brigatinib outside of the U.S. In connection with this process, ARIAD contacted pharmaceutical companies with an oncology presence outside of the U.S., including Takeda. Following discussions, ARIAD received non-binding proposals from six companies, including Takeda. Certain of these

companies, including Takeda, indicated an interest in a broader global partnership with respect to brigatinib.

40.     On December 9, 2016, the Company received a non-binding offer letter from Takeda indicating that Takeda would be interested in pursuing a transaction to acquire the Company for all-cash consideration at $20.00 per share.  In the letter, Takeda indicated that it was prepared to complete its diligence on the Company expeditiously and strongly desired to enter into a definitive agreement with the Company before January 9, 2017.

41.     At a December 12 and 13, 2016 Board meeting, the Board reviewed Takeda's non-binding offer and next steps with respect to its response to Takeda.  The Board also considered the potential engagement of J.P. Morgan Securities LLC ("J.P. Morgan") as a financial advisor to the Company, and the fact that an affiliate of J.P. Morgan was a counterparty to certain note hedge and warrant transactions (the "note hedge and warrant transactions") entered into by the Company on June 12, 2014 in connection with the issuance of its outstanding convertible notes.  The Board further considered that the unwinding of the note hedge and warrant transactions in connection with a proposed transaction could result in a net payment due to or from the Company or J.P. Morgan's affiliate, as well as certain potential economic benefits under such affiliate's hedge positions relating to the note hedge and warrant transactions that J.P. Morgan's affiliate could realize if a proposed transaction occurred.[1]  Despite the potential conflict of interest, the Board approved the engagement of J.P. Morgan as the Company's financial advisor.  The Board also directed Panayiotopoulos and J.P. Morgan to contact three

---

[1] Although J.P. Morgan and ARIAD terminated the note hedge and warrant transactions on January 8, 2017, in connection with the termination and related unwinding of related hedging and other market transactions, J.P. Morgan and its affiliates realized a currently estimated net gain (after taking into account any hedging gains or losses) of approximately $29,000,000 to $34,000,000.

industry participants (referred to in the Solicitation Statement as Companies 1-3) and to invite them to participate in management meetings with a view toward submitting an acquisition proposal on an expedited timeframe if they wished to do so.

42. Between December 18 and December 22, 2016, the Company entered into confidentiality agreements with Takeda, Company 2, and Company 3. The confidentiality agreements included standstill provisions for, with respect to Takeda and Company 2, a period of two years, and with respect to Company 3, a period of eighteen months. The Solicitation Statement is silent as to whether these standstill provisions contained "don't-ask, don't waive" provisions that preclude the parties from requesting any waiver of the live standstill provisions to submit a topping bid for the Company post-signing.

43. On December 21, 2016, representatives of the Company's senior management and J.P. Morgan held a management meeting with representatives of Company 2.

44. On December 22, 2016, Takeda submitted an updated non-binding offer to acquire the Company for $22.00 in cash per share. The updated proposal contemplated an announcement of the transaction no later than January 9, 2017.

45. On the morning of December 23, 2016, representatives of the Company's senior management and J.P. Morgan held a management meeting with representatives of Company 3.

46. Later that day, at a meeting of the Board's Coordination Committee, comprised of Individual Defendants Protopapas, Denner, and Panayiotopoulos, the Company's senior management reported to the Coordination Committee that Company 2 had indicated that it was not interested in pursuing a transaction, and that Company 1 and Company 3 had not yet provided any substantive feedback.

47.     On the evening of December 23, 2016, at the direction of the Coordination Committee, Panayiotopoulos informed Christophe Weber ("Weber"), Takeda's President and CEO, that, while the Company would evaluate Takeda's offer, the Coordination Committee was not prepared at that time to recommend to the Board that the Company accept Takeda's proposal. At the Board's direction, defendant Panayiotopoulos further indicated to Weber that if Takeda were to submit a further revised proposal with an offer price in the "mid $20s," the Coordination Committee would be supportive of moving forward with Takeda.

48.     On December 24, 2016, Weber informed Panayiotopoulos that Takeda would be submitting a "best and final" revised offer of $24.00 per share.  Weber also insisted on the Company and Takeda entering into an exclusivity agreement covering the period through January 9, 2017, during which, among other things, the Company would be prohibited from soliciting alternative proposals from other parties.  Takeda submitted its revised non-binding proposal shortly thereafter.

49.     The Board met on December 25, 2016 to consider Takeda's latest non-binding offer from December 24, 2016.  Despite the outstanding interest from Company 1 and Company 3, the Board authorized the grant of exclusivity to Takeda until January 9, 2017 and authorized the Coordination Committee and the Company's advisors to proceed with negotiations with Takeda.

50.     The next day, Takeda and ARIAD entered into an exclusivity agreement, whereby the Company granted Takeda a period of exclusivity until January 9, 2017 (the "Exclusivity Agreement").

51.     Apparently unaware of ARIAD's apparently self-imposed exigent timeline to sell the Company or the Exclusivity Agreement, on December 27, 2016, Company 3 submitted a list

of due diligence questions to ARIAD.  Pursuant to the Exclusivity Agreement, ARIAD ignored Company 3.

52.     On January 6, 2017, the Company engaged Goldman Sachs & Co. ("Goldman Sachs") and Lazard Frères & Co. LLC ("Lazard") as financial advisors in connection with the transaction.

53.     Two days later, following a review of each of J.P. Morgan's, Goldman Sachs', and Lazard's respective financial analyses, the Board approved the Merger Agreement.  Takeda and ARIAD executed the Merger Agreement shortly thereafter.

***The Inadequate Proposed Transaction***

54.     On January 8, 2017, the Board caused the Company to enter into the Merger Agreement, pursuant to which ARIAD will be acquired for inadequate consideration.

55.     The Individual Defendants have all but ensured that another entity will not emerge with a competing proposal by agreeing to a "no solicitation" provision in the Merger Agreement that prohibits the Individual Defendants from soliciting alternative proposals and severely constrains their ability to communicate and negotiate with potential buyers who wish to submit or have submitted unsolicited alternative proposals.  Section 6.02(a) of the Merger Agreement states:

> (a) Except as permitted by this Section 6.02, from the date of this Agreement until the consummation of the Offer or, if earlier, the termination of this Agreement in accordance with its terms, the Acquired Companies shall not, and shall direct their respective Representatives not to, directly or indirectly (i) initiate, solicit or knowingly encourage or knowingly facilitate the making of any Acquisition Proposal or any inquiry, proposal or request for information that could reasonably be expected to lead to, or result in, an Acquisition Proposal, (ii) other than informing Third Parties of the existence of the provisions contained in this Section 6.02, engage in, continue or otherwise participate in negotiations or discussions with, or furnish any non-public information concerning the Company or any of the Company Subsidiaries to, any Third Party in connection with or for the purpose of knowingly encouraging or knowingly facilitating an Acquisition

Proposal or any inquiry, proposal or request for information that could reasonably be expected to lead to, or result in, an Acquisition Proposal, (iii) enter into any letter of intent, acquisition agreement, agreement in principle or similar agreement with respect to an Acquisition Proposal or any proposal or offer that could reasonably be expected to lead to an Acquisition Proposal or (iv) resolve or agree to do any of the foregoing. Promptly following the execution of this Agreement, on the date hereof, the Acquired Companies shall, and shall direct their respective Representatives to, (A) cease and cause to be terminated all existing discussions or negotiations with any Person conducted heretofore with respect to any Acquisition Proposal or any inquiry, or request for information that could reasonably be expected to lead to, or result in, an Acquisition Proposal and (B) terminate access by any Third Party to any physical or electronic data room relating to any potential Acquisition Transaction. Within three (3) Business Days of the execution of this Agreement, the Company shall request the prompt return or destruction of any confidential information provided to any Third Party within the twelve (12) months immediately preceding the date of this Agreement in connection with a proposed Acquisition Transaction. Notwithstanding anything herein to the contrary, the Company shall be permitted to grant waivers of, and not enforce, any standstill provision or similar provision that has the effect of prohibiting the counterparty thereto from making a private Acquisition Proposal to the Company Board.

56.    Further, the Company must promptly advise Takeda of any proposals or inquiries

received from other parties. Section 6.02(g) of the Merger Agreement states:

(g) The Company shall promptly (and in any event no later than the earlier to occur of (i) one (1) Business Day and (ii) forty-eight (48) hours after receipt) advise Parent orally or in writing in the event that the Company receives any Acquisition Proposal or any inquiry, proposal or request for information that could reasonably be expected to lead to, or result in, an Acquisition Proposal, and in connection with such notice, provide to Parent the terms and conditions (including the identity of the Third Party making any such Acquisition Proposal), other than immaterial terms and conditions, of any such Acquisition Proposal. The Company shall (i) keep Parent reasonably informed on a current basis of the status, details and terms (other than immaterial details and terms) of any such Acquisition Proposal (including, prior to furnishing any information or to participating in any discussions or negotiations pursuant to Section 6.02(b), advising Parent of any determination by the Company Board pursuant to Section 6.02(b)) and any discussions and negotiations concerning the terms and conditions (other than immaterial terms and conditions) thereof and (ii) provide to Parent as soon as practicable (and in any event no later than the earlier to occur of (i) one (1) Business Day and (ii) forty-eight (48) hours after receipt or delivery thereof) any written indication of interest (or amendment thereto) or any written material that constitutes an offer (or amendment thereto) including copies of any proposed Alternative Acquisition Agreements and any financing commitments

related thereto.

57.    Moreover, the Merger Agreement contains a highly restrictive "fiduciary out" provision permitting the Board to withdraw its approval of the Proposed Transaction under extremely limited circumstances, and grants Takeda a "matching right" with respect to any "Superior Proposal" made to the Company.  Sections 6.02(e) and (f) of the Merger Agreement provide:

> (e) Notwithstanding anything to the contrary contained in this Agreement, at any time prior to the consummation of the Offer if, (i) in response to a bona fide written Acquisition Proposal made after the date of this Agreement and not withdrawn that did not result from a breach of this Section 6.02, the Company Board determines in good faith (after consultation with its outside counsel and financial advisors) that such Acquisition Proposal constitutes a Superior Proposal and (ii) the failure to do so would reasonably be expected to be inconsistent with its fiduciary obligations under Applicable Law, (A) subject to compliance with Section 6.02(f), the Company Board may make a Change in Recommendation or (B) the Company may terminate this Agreement pursuant to Section 8.01(d)(i) in order to enter into an Alternative Acquisition Agreement with respect to such Superior Proposal; provided, however, that the Company shall not terminate this Agreement pursuant to Section 8.01(d)(i) unless the Company (x) has complied with its obligations under Section 6.02(f), (y) pays, or causes to be paid, to Parent the Termination Fee payable pursuant to Section 9.04(b) prior to or concurrently with to such termination and (z) concurrently with such termination, enters into a definitive Alternative Acquisition Agreement that documents the terms and conditions of such Superior Proposal.

> (f) Notwithstanding anything to the contrary contained in this Agreement, the Company shall not be entitled to make a Change in Recommendation pursuant to Section 6.02(e) or terminate this Agreement pursuant to Section 8.01(d)(i) unless (x) the Company shall have provided to Parent four (4) Business Days' prior written notice (the "Superior Proposal Notice"), which notice shall not constitute a Change in Recommendation, advising Parent that the Company intends to take such action (and specifying, in reasonable detail, the reasons for such action and the material terms and conditions of any such Superior Proposal), and (y):

> (i) during such four (4) Business Day period, if requested by Parent in good faith, the Company and its Representatives shall have engaged in good faith negotiations with Parent regarding changes to the terms of this Agreement intended by Parent to cause such Acquisition Proposal to no longer constitute a Superior Proposal; and

(ii) the Company Board shall have considered any adjustments to this Agreement (including a change to the price terms hereof) and any other agreements that may be proposed in writing by Parent (the "Proposed Changed Terms") no later than 11:59 p.m., New York City time, on the fourth (4th) Business Day of such four (4) Business Day period and shall have determined in good faith (after consultation with its outside legal counsel and financial advisors) that the Superior Proposal would continue to constitute a Superior Proposal if such Proposed Changed Terms were to be given effect, and that the failure to make the Change in Recommendation or terminate this Agreement pursuant to Section 8.01(d)(i) would reasonably be expected to be inconsistent with its fiduciary obligations of the Company Board under Applicable Law.

For the avoidance of doubt, any (1) material revisions to the terms of a Superior Proposal or (2) material revisions to an Acquisition Proposal that the Company Board had determined no longer constitutes a Superior Proposal, shall constitute a new Acquisition Proposal and shall in each case require the Company to deliver to Parent a new Superior Proposal Notice, except that the references to four (4) Business Days in this Section 6.02(f) shall be deemed to be two (2) Business Days.

58.     Further locking up control of the Company in favor of Takeda, the Merger Agreement provides for a "termination fee" of $169 million, payable by the Company to Takeda if the Individual Defendants cause the Company to terminate the Merger Agreement.

59.     By agreeing to all of the deal protection devices, the Individual Defendants have locked up the Proposed Transaction and have precluded other bidders from making successful competing offers for the Company.

60.     Additionally, Individual Defendants and two funds affiliated with Sarissa Capital Management LP ("Sarissa Capital," of which Individual Defendant Denner is the Chief Investment Officer), which collectively beneficially own an aggregate of 15,219,504 Company shares, have entered into a tender agreement, pursuant to which they will tender their shares in the tender offer.  Accordingly, such shares are already locked up in favor of the Proposed Transaction.

***Inadequate Merger Consideration and Interests of the Company's Officers and Directors***

61.     The consideration to be paid to plaintiff and the Class in the Proposed Transaction is inadequate.

62.     Among other things, the intrinsic value of the Company is materially in excess of the amount offered in the Proposed Transaction.

63.     Further, the merger consideration fails to adequately compensate the Company's stockholders for the significant synergies resulting from the merger.

64.     Accordingly, the Proposed Transaction will deny Class members their right to share proportionately and equitably in the true value of the Company's valuable and profitable business, and future growth in profits and earnings.

65.     Meanwhile, certain of the Company's officers and directors stand to receive substantial benefits as a result of the Proposed Transaction.

66.     For example, Individual Defendant Panayiotopoulos stands to receive $24,857,335 in connection with the Proposed Transaction.  Manmeet S. Soni, Chief Financial Officer of the Company, stands to receive $16,390,226, and Timothy P. Clackson, Chief Scientific Officer of the Company, stands to receive $9,980,287.

***The Solicitation Statement Omits Material Information, Rendering It False and Misleading***

67.     Defendants filed the Solicitation Statement with the SEC in connection with the Proposed Transaction.

68.     The Solicitation Statement omits material information regarding the Proposed Transaction, which renders the Solicitation Statement false and misleading.

69.     First, the Solicitation Statement omits material information regarding ARIAD's financial projections and the financial analyses performed by J.P. Morgan, Goldman Sachs, and Lazard in support of their so-called fairness opinions.

70.     With respect to ARIAD's financial projections, the Solicitation Statement fails to disclose:  (i) the non-probability adjusted forecasts, including total revenue, for all projection years; (ii) the separate constituents making up total operating expenses, including but not limited to cost of goods sold, stock-based compensation expense, SG&A, and R&D; (iii) the detailed projections as used by Goldman Sachs in its *WholeCo Discounted Cash Flow Analysis*, reflecting the research and development activities assumed to generate a product pipeline for the Company beyond the currently identified pipeline; (iv) the detailed product-level projections utilized by both J.P. Morgan and Goldman Sachs in their *Sum-of-the-Parts Discounted Cash Flow Analyses*, which utilized separate discounted cash flow analyses, and consequently separate projections, for the various products and items of the Company; (v) a reconciliation of all GAAP to non-GAAP metrics; (vi) when the financial projections were created; (vii) the quantification of the probabilities, assigned by Company management, of achieving regulatory success and/or commercial success with its products and the sources of the quantification of the probabilities assigned by Company management; (viii) the probability of success adjusted estimates of the free cash flows to be generated from each of the Company's products; and (ix) the non-probability-adjusted estimates of the free cash flows to be generated from each of the Company's products.

71.     With respect to J.P. Morgan's *Discounted Cash Flow Analysis*, the Solicitation Statement fails to disclose:  (i) the unlevered free cash flows for each of the Company's existing and pipeline products; (ii) the inputs and assumptions used to determine the discount rate range

of 11.0% to 13.0%; (iii) the specific hypothetical terminal values assigned by J.P Morgan to each of the existing and pipeline product, stock-based compensation expense, discovery research and development expenses, and COGS absorption; (iv) the present value of the stock-based compensation expense, discovery research and development expenses, COGS absorption, and cash tax savings from net operating losses; (v) the implied pricing multiples corresponding to the terminal value growth rate; and (vi) the revenues from the Company's licensing agreement with Medinol Ltd.

72.     With respect to Goldman Sachs' *Illustrative WholeCo Discounted Cash Flow Analysis*, the Solicitation Statement fails to disclose: (i) the inputs and assumptions used to determine the discount rate range of 13.0% to 15.0%, (ii) the inputs and assumptions used to determine the perpetuity growth rate range of 1.0% to 3.0%; and (iii) the net debt of the Company as of September 20, 2016.

73.     With respect to Goldman Sachs' *Illustrative Sum-of-the-Parts Discounted Cash Flow Analysis*, the Solicitation Statement fails to disclose: (i) the probability of success adjusted estimates of the free cash flows to be generated from each of the Company's products; (ii) the inputs and assumptions used to determine the discount rate range utilized by Goldman Sachs; (iii) the estimates of the benefits to be derived by the Company from its utilization of its net operating losses; (iv) the range of illustrative negative values for certain expenses that had not been allocated to specific products; and (v) the net debt figure used in the analysis.

74.     With respect to Lazard's *Discounted Cash Flow Analysis*, the Solicitation Statement fails to disclose: (i) the inputs and assumptions used to determine the discount rate range of 12.0% to 14.0%; and (ii) the estimates of the benefits to be derived by the Company from its utilization of its net operating losses.

75.     With respect to Lazard's *Precedent Transactions Analysis*, the Solicitation Statement fails to disclose the individual multiples for the transactions observed by Lazard in its analysis.

76.     The disclosure of projected financial information is material because it provides stockholders with a basis to project the future financial performance of a company, and allows stockholders to better understand the financial analyses performed by the company's financial advisor in support of its fairness opinion.   Moreover, when a banker's endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed.

77.     The omission of this material information renders the Solicitation Statement false and misleading, including, *inter alia*, the following sections of the Solicitation Statement: (i) "Background of Offer and Merger"; (ii) "Reasons for Recommendation"; (iii) "Certain Unaudited Prospective Financial Information"; and (iv) "Opinions of Financial Advisors."

78.     Second, the Solicitation Statement omits material information regarding potential conflicts of interest of each of the financial advisors engaged by the Board in connection with the Proposed Transaction, *i.e.*, J.P. Morgan, Goldman Sachs, and Lazard.

79.     With respect to J.P. Morgan, the Solicitation Statement states that, in the past two years, J.P. Morgan has received aggregate fees from the Company in the amount of approximately $1.1 million and from Parent approximately $1.4, yet states that "neither J.P. Morgan nor its affiliates have had any other material financial advisory or other material commercial or investment banking relationships with the Company or Parent."   The Solicitation

Statement fails to disclose the nature of the past services rendered to the Company and Parent, and the basis for the statement that such relationships were not "material."

80.     With respect to Goldman Sachs, the Solicitation Statement states that, in the past two years, Goldman Sachs "received compensation for financial advisory and/or underwriting services provided by its Investment Banking Division to the Company and/or its affiliates of approximately $2 million," but fails to disclose services provided to the Company and/or the transaction(s) in which Goldman Sachs was involved.  Additionally, the Solicitation Statement states that "Goldman Sachs also has provided certain financial advisory and/or underwriting services to Parent and/or its affiliates from time to time," but fails to disclose the nature of those services.

81.     With respect to Lazard, the Solicitation Statement states that "Lazard has in the past two years provided certain investment banking services to the Company," but fails to disclose the nature of those services and the amount of compensation it earned from the Company for those services.  Additionally, the Solicitation Statement fails to disclose whether Lazard has provided any services for Parent or its affiliates in the past two years, and if so, the nature of those services and the amount of compensation it earned for those services.

82.     Because of the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives, it is imperative that there be full disclosure of investment banker compensation, services, and all potential conflicts.  The disclosure of this information is particularly material in this case in light of the fact that the Board deemed it necessary to engage two additional bankers (Goldman Sachs and Lazard) for the combined compensation of $11 million (not including the $33 million that it owes J.P. Morgan) as a result of the Board's belated consideration of J.P. Morgan's conflict of interest due

to its selling of convertible note hedge options to the Company in 2004 and purchasing from the Company warrants relating to the common stock.  It is imperative that stockholders be able to decide for themselves what weight to place on a conflict faced by the Board's financial advisors.

83.     The omission of this material information renders the Solicitation Statement false and misleading, including, *inter alia*, the following sections of the Solicitation Statement: (i) "Background of Offer and Merger"; (ii) "Reasons for Recommendation"; and (iii) "Opinions of Financial Advisors."

84.     Third, the Solicitation Statement omits material information regarding the background of the Proposed Transaction.  The Company's stockholders are entitled to an accurate description of the "process" the directors used in coming to their decision to support the Proposed Transaction.

85.     For example, the Solicitation Statement fails to disclose whether the confidentiality agreements entered into between the Company and several industry participants in the fall of 2015 contained standstill provisions that are still in effect and/or "don't-ask-don't-waive" standstill provisions that are presently precluding these industry participants from making a topping bid for the Company.  Similarly, the Solicitation Statement fails to disclose whether the confidentiality agreements that contained standstill provisions entered into between the Company and each of Company 2 and Company 3 contained "fall-away" provisions that would allow each of Company 2 and Company 3 to submit a superior proposal to acquire the Company or whether the standstill provisions are still in effect and include "don't-ask-don't-waive" provisions that are presently precluding Company 2 and Company 3 from making a topping bid for the Company.

86.     Additionally, the Solicitation Statement fails to disclose whether any parties (in addition to Company 3) contacted ARIAD regarding a potential transaction or interest in the Company during the exclusivity period with Takeda.

87.     The omission of this material information renders the Solicitation Statement false and misleading, including, *inter alia*, the following sections of the Solicitation Statement: (i) "Background of Offer and Merger"; and (ii) "Reasons for Recommendation."

88.     Fourth, the Solicitation Statement omits material information regarding potential conflicts of interest of the Company's officers and directors.

89.     Specifically, the Solicitation Statement fails to disclose the timing and nature of all communications regarding future employment and/or directorship of ARIAD's officers and directors, including who participated in all such communications.

90.     Communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders.  This information is necessary for stockholders to understand potential conflicts of interest of management and the Board, as that information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders.

91.     The omission of this material information renders the Solicitation Statement false and misleading, including, *inter alia*, the following sections of the Solicitation Statement:  (i) "Past Contacts, Transactions, Negotiations and Agreements"; (ii) "Background of Offer and Merger"; and (iii) "Reasons for Recommendation."

92.     The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to ARIAD's stockholders.

## COUNT I

### (Claim for Violation of Section 14(e) of the 1934 Act Against Defendants)

93.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

94.     Section 14(e) of the 1934 Act states, in relevant part, that:

It shall be unlawful for any person to make any untrue statement of a material fact
or omit to state any material fact necessary in order to make the statements made,
in the light of the circumstances under which they are made, not misleading . . . in
connection with any tender offer or request or invitation for tenders[.]

95.     Defendants disseminated the misleading Solicitation Statement, which contained

statements that, in violation of Section 14(e) of the 1934 Act, in light of the circumstances under

which they were made, omitted to state material facts necessary to make the statements therein

not misleading.

96.     The Solicitation Statement was prepared, reviewed, and/or disseminated by

defendants.

97.     The Solicitation Statement misrepresented and/or omitted material facts in

connection with the Proposed Transaction as set forth above.

98.     By virtue of their positions within the Company and/or roles in the process and

the preparation of the Solicitation Statement, defendants were aware of this information and their

duty to disclose this information in the Solicitation Statement.

99.     The omissions in the Solicitation Statement are material in that a reasonable

shareholder will consider them important in deciding whether to tender their shares in connection

with the Proposed Transaction.  In addition, a reasonable investor will view a full and accurate

disclosure as significantly altering the total mix of information made available.

100.    Defendants knowingly or with deliberate recklessness omitted the material information identified above in the Solicitation Statement, causing statements therein to be materially incomplete and misleading.

101.    By reason of the foregoing, defendants violated Section 14(e) of the 1934 Act.

102.    Because of the false and misleading statements in the Solicitation Statement, plaintiff and the Class are threatened with irreparable harm.

103.    Plaintiff and the Class have no adequate remedy at law.

## COUNT II

### (Claim for Violation of 14(d) of the 1934 Act Against Defendants)

104.    Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

105.    Section 14(d)(4) of the 1934 Act states:

Any solicitation or recommendation to the holders of such a security to accept or reject a tender offer or request or invitation for tenders shall be made in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

106.    Rule 14d-9(d) states, in relevant part:

Any solicitation or recommendation to holders of a class of securities referred to in section 14(d)(1) of the Act with respect to a tender offer for such securities shall include the name of the person making such solicitation or recommendation and the information required by Items 1 through 8 of Schedule 14D-9 (§ 240.14d-101) or a fair and adequate summary thereof[.]

Item 8 requires that directors must "furnish such additional information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not materially misleading."

107.    The Solicitation Statement violates Section 14(d)(4) and Rule 14d-9 because it omits the material facts set forth above, which renders the Solicitation Statement false and/or misleading.

108.    Defendants knowingly or with deliberate recklessness omitted the material information set forth above, causing statements therein to be materially incomplete and misleading.

109.    The omissions in the Solicitation Statement are material to plaintiff and the Class, and they will be deprived of their entitlement to make a fully informed decision with respect to the Proposed Transaction if such misrepresentations and omissions are not corrected prior to the expiration of the tender offer.

110.    Plaintiff and the Class have no adequate remedy at law.

## COUNT III

**(Claim for Violation of Section 20(a) of the 1934 Act
Against the Individual Defendants and Takeda)**

111.    Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

112.    The Individual Defendants and Takeda acted as controlling persons of ARIAD within the meaning of Section 20(a) of the 1934 Act as alleged herein.  By virtue of their positions as officers and/or directors of ARIAD and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Solicitation Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading.

113.    Each of the Individual Defendants and Takeda was provided with or had unlimited access to copies of the Solicitation Statement alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

114.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same.   The Solicitation Statement contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction.   They were thus directly connected with and involved in the making of the Solicitation Statement.

115.    Takeda also had direct supervisory control over the composition of the Solicitation Statement and the information disclosed therein, as well as the information that was omitted and/or misrepresented in the Solicitation Statement.

116.    By virtue of the foregoing, the Individual Defendants and Takeda violated Section 20(a) of the 1934 Act.

117.    As set forth above, the Individual Defendants and Takeda had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the 1934 Act and Rule 14a-9, by their acts and omissions as alleged herein.   By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the 1934 Act.

118.    As a direct and proximate result of defendants' conduct, plaintiff and the Class are threatened with irreparable harm.

119.    Plaintiff and the Class have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment and relief as follows:

A.    Enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

B.      In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

C.      Directing the Individual Defendants to file a Solicitation Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D.      Declaring that defendants violated Sections 14(e), 14(d), and 20(a) of the 1934 Act, as well as Rule 14a-9 promulgated thereunder;

E.      Awarding plaintiff the costs of this action, including reasonable allowance for plaintiff's attorneys' and experts' fees; and

F.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: January 28, 2017

OF COUNSEL:

**RIGRODSKY & LONG, P.A.**
Brian D. Long
Gina M. Serra
2 Righter Parkway, Suite 120
Wilmington, DE 19803
(302) 295-5310

**RM LAW, P.C.**
Richard A. Maniskas
995 Old Eagle School Road, Suite 311
Wayne, PA 19087
(484) 588-5516

**MATORIN LAW OFFICE, LLC**

By:   _/s/ Mitchell J. Matorin_
        Mitchell J. Matorin (BBO# 649304)
        Matorin Law Office, LLC
        18 Grove Street, Suite 5
        Wellesley, MA 02482
        (781) 453-0100

        *Attorneys for Plaintiff*